UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROCKETFUEL BLOCKCHAIN COMPANY
and ROCKETFUEL BLOCKCHAIN, INC.,

                                        Plaintiffs,

                    -*against*-

ELLENOFF GROSSMAN & SCHOLE LLP,

                                        Defendant.

21 Civ. 1764 (VEC)

SECOND AMENDED COMPLAINT

PLAINTIFFS DEMAND
TRIAL BY JURY

Plaintiffs RocketFuel Blockchain Company and RocketFuel Blockchain, Inc., for
their Second Amended Complaint against defendant Ellenoff Grossman & Schole LLP, by their
attorneys Scarola Zubatov Schaffzin PLLC, allege:

*The Parties*

1.       Plaintiff RocketFuel Blockchain Company is a corporation organized
and existing under the laws of the State of Nevada with its principal place of business in the State
of Nevada.

2.       Plaintiff RocketFuel Blockchain, Inc., is a corporation organized and
existing under the laws of the State of Nevada with its principal place of business in the State of
Nevada.

3.       Defendant Ellenoff Grossman & Schole LLP is a law firm limited
liability partnership organized and existing under the laws of the State of New York with its
principal place of business in the State of New York, and with all of its members being natural

persons who are citizens and residents of states other than the State of Nevada.

*Jurisdiction and Venue*

4.      This Court has personal jurisdiction over the defendant as it is a citizen of the State of New York.  Jurisdiction in this court is proper under 28 U.S.C. §1332(a) because the plaintiffs are citizens of the State of Nevada and defendant is a citizen of the State of New York (with no member of defendant being a citizen of the State of Nevada), and the amount in controversy in this case (the amount the plaintiffs seek to recover) exceeds $75,000 exclusive of interest and costs.

5.      Venue in this Court is proper under 28 U.S.C. §1391(b)(l) & (2) because the defendant resides in the State of New York and a substantial part of the events and omissions giving rise to this case occurred in the State of New York.

*Facts Pertinent to More than One Claim for Relief*

6.      This case arises from legal malpractice, gross negligence and wanton and reckless conduct, breach of fiduciary duty and breach of contract by defendant by Ellenoff Grossman & Schole LLP ("EGS") in connection with defendant's representation of RocketFuel Blockchain Company ("RocketFuel") relating to a venture that included a reverse acquisition transaction that was to take place in which RocketFuel would be acquired by B4MC Gold Mines, Inc. ("B4MC") in exchange for shares of B4MC common stock representing a controlling interest (and the work done for the benefit of B4MC to which EGS is also liable under what is sometimes called the "privity" or "approaching-privity" standard).  (In September 2018, after the acquisition had closed, B4MC changed its name to RocketFuel Blockchain, Inc. ("RBI").)

A.  *The Origin of the Venture and Transactions in Late 2017 and 2018 — An Overview*

7.     Commencing in late 2017, discussions were conducted among a number of persons toward the possibility of developing and bringing to market a highly efficient, automated and secure check-out system for e-commerce merchants based upon blockchain technology through a company the stock of which would be publicly traded (to be accomplished by way of what is sometimes called a "reverse acquisition transaction").  One of these persons was Gert Funk, who had career experience in other forms of payment systems for e-commerce businesses.  These discussions also involved Joseph Page, who claimed to the others involved to have developed technology to support the business, which was subject to five patent applications then pending before the United States Patent and Trademark Office (the "PTO").  The venture as discussed and undertaken also included Henrik Rouf (and entities in which he was involved) and later, Carsten Jensen (and entities in which he was involved) and attorney Bennett J. Yankowitz.

8.     The venture contemplated operating in connection with a publicly traded company through a reverse acquisition transaction with what is sometimes known as a publicly traded "shell company" into which another, operating, company would be subsumed in a transaction in which shares of the operating company would be exchanged for shares of the public company.  Mr. Rouf, together with Mr. Yankowitz, had the ability to bring B4MC into the venture and contemplated transaction as the publicly traded entity.  As Mr. Page has stated it, Mr. Page would participate in the venture by bringing his patent applications to the transactions; others involved would be bringing other skills, assets or capacities.[1]

---

[1] As plaintiffs allege and explain separately herein, they are involved in litigation with Mr. Page over issues related to those presented here.  Plaintiffs make clear that to the extent they refer to Mr. Page or any allegations or statements that he might have made, plaintiffs do not rely upon those statements as necessary to their claims herein (except to the extent of his false statements as alleged herein), independently verify or endorse anything Mr. Page says or has said and disagree with and contest many allegations he has made in other contexts.  Plaintiffs offer those statements for what context they add to their other allegations which, plaintiffs maintain, are in themselves sufficient to state valid claims for relief in this case.

9.     The others involved in the venture later learned, as alleged more fully herein, that Mr. Page did not in fact have the five patent applications he claimed to have — they had been abandoned before the PTO long before — and he therefore brought nothing of value to the transaction and was not essential to it.  He never was.

10.     As is alleged herein, EGS had the role of doing due diligence as counsel in the transactions to discover facts precisely of that sort — that the Page patent applications were not in fact valid or viable.

11.     In substance, Mr. Page had no valid patent applications to bring to the transaction.

12.     As is also alleged herein, EGS either failed, as a matter of negligence, in discovering that the Page patent applications were not in fact valid or viable or, as Mr. Page has alleged elsewhere, actually knew that the patent applications were not valid or viable, and thereby acted grossly negligently and in a wanton and reckless manner in carrying out its work for and duties to plaintiffs, and breached other duties, including fiduciary duties, to the plaintiffs, by not telling them.

B.  *The EGS Retention and Retainer Agreement*

13.     RocketFuel entered into an Engagement Agreement with EGS in March 2018 pertaining to the contemplated transactions.  (A copy of the Engagement Agreement is Exhibit A.)

14.     EGS provided legal services to RocketFuel (and also for the benefit of B4MC as alleged more fully below) commencing in early March 2018, including as alleged herein and including as affirmatively stated by EGS.

15.     The EGS retainer agreement specifically stated that under the EGS

4

engagement EGS would "supervise and manage all necessary due diligence."  Those legal

services with respect to performance of "necessary due diligence" of necessity included due

diligence as to the Page patent applications to ensure that they were in proper order and that such

patent applications were part of the assets of the venture because, as alleged more fully below,

EGS itself understood that those were the only assets of the venture (apart from its concept and

what the other people involved would bring to it) as to which there could be due diligence.

16.     As is also alleged more fully below, EGS in fact did undertake such due

diligence to ensure that the patent applications were in proper order, but simply failed in doing so

(or else learned the truth, but did not perform its duty to inform its clients of that truth).

C.  *Summary Description of the Central Claims and Allegations*

17.     The contemplated transaction to establish the venture as part of a publicly

traded company closed on June 27, 2018.

18.     Subsequent to that closing, EGS continued to represent RocketFuel (which

became a 100% subsidiary of B4MC) and also B4MC (now known as RBI).  The Engagement

Agreement with EGS (Exhibit A) also provided that EGS would represent B4MC in "ongoing

corporate and securities matters for the Company following the merger."

19.     As alleged above, EGS's services prior to the reverse acquisition in June

2018 included in fact conducting due diligence, as alleged more fully below, into the Page patent

application's status and viability, as well as preparation of the contribution agreement related to

the transaction and related closing documents for the reverse acquisition transaction, preparation

of the "Super 8-K" disclosure filed with the Securities and Exchange Commission in connection

with the reverse acquisition transaction, and also included, including after the closing,

preparation of associated SEC filings such as preparation of B4MC's/RBI's quarterly and annual

reports to the SEC (Forms 10-K and 10-Q).

20.     As alleged above, RocketFuel's only assets at the time of the transaction were, to the extent there were any in fact, the five patent applications assigned by Mr. Page who became one of its shareholders in contemplation of and in connection with the reverse acquisition transaction as the consideration from him as part of the transaction.

21.     In consideration of the assignments, Page initially received 300 shares of RocketFuel common stock, which he subsequently exchanged for 5,100,394 shares of B4MC (now known as RBI) common stock at the closing of the reverse acquisition transaction.

22.     Based upon the value of and the transactions in the publicly traded shares of RBI, Page received value in excess of $45,000,000 at the time of the closing of the reverse acquisition transaction. The RBI shares he received were valued at $9.00 per share as the closing market price of those shares quoted at that time on the OTC Pink sheets (and no less than, $11,000,000 based upon pricing at the time of the filing of this action).

23.     In May 2019 Joseph Page resigned as an officer and Director of RBI.

24.     Subsequently, commencing at around that time, RocketFuel and RBI, through patent counsel, discovered that three of those patent applications assigned by Page had been previously abandoned and were otherwise not as expected prior to Page's assignment to RocketFuel, and prior to the reverse acquisition transaction, and that all five had substantial deficiencies.

25.     Page's filings with the PTO had been on a private and confidential basis, and there had been no way for RocketFuel (or B4MC or any other person or party) to learn of these deficiencies from a public record without assistance of EGS or other similar assistance of the type EGS was providing.

26.     The result of these deficiencies was that the assignments were of little or no value and might not be salvageable at all despite best efforts that RocketFuel might make.  In fact, in October 2014 Page had petitioned the PTO to withdraw its holding that one of the patents was abandoned, which petition the PTO denied in 2015, three years prior to the subject transactions.

27.     A substantial part of EGS's engagement, and its actual work in fact, per its retainer agreement and prior to the consummation of the reverse acquisition transaction, was to conduct due diligence with regard to the existence, proper form and good order, and assignment of the five patent applications, including confirmation that there were no such deficiencies as were later discovered (including such that were not readily apparent from the public record).

28.     As alleged more fully below, plaintiffs learned in the middle of 2019 that the Page patent applications had been abandoned long before the venture at issue commenced in late 2017.

29.     As alleged above, EGS either failed, as a matter of negligence, to discover that the Page patent applications were not in fact valid or viable or, as Mr. Page has alleged elsewhere, actually knew that the patent applications were not valid or viable, and acted grossly negligently, recklessly and wantonly, and breached other duties, including fiduciary duties, to the plaintiffs by not telling them the truth EGS had learned.

30.     RocketFuel and RBI have sued Page relating to these transactions and that lawsuit is pending in United States District Court in Las Vegas, Nevada.

D.  *The Details of the Joseph Page Fraud (the Abandonment of His Patent Applications) that EGS's Due Diligence Did Not Discover or that EGS Did Not Disclose to Plaintiffs if EGS Did Discover It.*

31.     As alleged above, Joseph Page told the other parties involved with

RocketFuel and B4MC/RBI that Mr. Page had five pending patent applications in the process of being examined by the PTO that covered the blockchain payment technology the venture intended to and would develop and which would be his contribution to the venture to develop a blockchain based e-commerce payment technology platform.

32.     As alleged above, Mr. Page lied about this to the others involved in the venture through the time of the reverse acquisition transaction and for a long time after it closed in June 2018 and no one among the others involved learned the truth ─ from Mr. Page, EGS or anyone else ─ until approximately a year later in 2019.  EGS knew at all times before the transaction and until the truth emerged in 2019 that no one among the others involved was aware that the Page patent applications had been abandoned well before 2018.

33.     In fact, while Mr. Page had filed five such patent applications, through a company he owned (Blockchain, Inc.), in earlier years, each of those five patent applications had been abandoned (and suffered other, additional defects, as well) well before Mr. Page first discussed the venture in 2017 with those who would participate in it through RocketFuel and B4MC/RBI such that Mr. Page in fact had no pending applications for technology relevant to the venture.

34.     Mr. Page did not disclose the fact that his five patent applications had been abandoned and were otherwise defective to any of those involved in the venture until a long time after the reverse acquisition transaction closed in June 2018, including not to any of Gert Funk, Henrik Rouf, Carsten Jensen or Bennett Yankowitz, anyone associated with them or the entities with which they were affiliated and which were involved in the transactions or to any other person or entity involved in the venture and transactions.

35.     Mr. Page acted alone and in secret in this regard (except to the extent

EGS may have learned the truth, but not disclosed it).

36.     In fact, Mr. Page persisted in the deception actively for more than a year after the reverse acquisition transaction closed.  For example, within a matter of days after the reverse acquisition transaction closed, upon which closing Mr. Page became a Director of B4MC, B4MC filed (as prepared by EGS) its so-called Super 8-K with the Securities and Exchange Commission through which the following disclosure was made:

> "Our technology is covered by five applications for U.S. patents.  Each application was submitted by our Chief Technical Officer ('CTO') and director, Joe Page, who assigned then to RocketFuel in exchange for his RocketFuel shares."

37.     Despite the significance of this disclosure, or Mr. Page's knowledge that it was false, Mr. Page, even though then a B4MC Director, took no steps to correct it or advise any of the others involved in the venture of the truth.

38.     In the summer of 2018, after the reverse acquisition transaction closed, Mr. Page participated in the promotion of the business through a brochure describing the business in which — immediately following a page where his personal short biography and photo appeared as one of three members of the "Core Team" — Mr. Page's five abandoned patent applications were described as if they had not in fact been abandoned.

39.     The document stated:

> "Several patent applications have already been filed and more in the pipeline ensuring concepts and technologies behind the RocketFuel including the checkout solutions and supporting administrative systems."

40.     The document then listed as those patent applications the five ostensible Page patent applications, including separately for each of the five (i) the patent application number, (ii) the date of filing and (iii) the title.  This document which Mr. Page among others used with the world-at-large represented the abandoned applications as being active and viable

when they were not.

41.     Mr. Page not only did nothing to correct this, but participated in that document's use.

42.     In October 16, 2018, in e-mail correspondence with others working toward the venture's end, Mr. Page responded to an inquiry about possibly adding additional patents that might be available to the ostensibly existing portfolio, giving no indication that he had conveyed only abandoned patent applications and stating:  "We ultimately have very good value in the portfolio we already have."  Again, Mr. Page did not disclose that his applications had been abandoned but represented them still in October 2018 as active and viable.

43.     In or about May 2019, Mr. Page made demands to RBI that were rejected, resigned as a Director and was asked to resign his positions as an officer in both RocketFuel and RBI.  In the discussions as to Mr. Page's separation from the business that followed, on or about June 3, 2019, during a conversation with Mr. Yankowitz, Mr. Page admitted — and disclosed to someone (anyone) associated with RocketFuel, RBI of their owners — for the first time that the patent applications had been abandoned.

44.     Even then, he did not state the dates on which the applications had been abandoned.  Mr. Yankowitz then wrote to Mr. Page on June 3, 2019, requesting that Mr. Page provide the exact date each patent application had been abandoned, the files for each patent application, the Image File Wrappers (IFW)[2] and all of Mr. Page's communications with the PTO.

45.     Still, even then in June 2019, Mr. Page refused to cooperate by simply

---

[2] According to the uspto.gov, the IFW system "uses technology to replace the paper processing of patent applications in the Office.  Paper components of these application files (including the specification, oath or declaration, drawings, information disclosure statements, amendments, Office actions, and file jacket notations) have been scanned to create electronic image files."

providing the requested information and files.

46.    RBI then retained patent attorney Mark Kendrick ("Kendrick") as patent counsel to replace Mr. Page who had served the functions of patent counsel as a registered patent agent.

47.    Mr. Kendrick became patent attorney of record of the Patent Applications in the PTO, replacing Mr. Page as patent agent.

48.    Mr. Kendrick reviewed and investigated the abandoned patent applications and uncovered the following information:

a.    Three of the five Patent Applications had been abandoned because of Mr. Page's failure to respond to a PTO action long before Mr. Page joined the venture in late 2017/early 2018:

i.    One abandoned 8/7/2014 because Mr. Page failed to pay an extra filing fee for additional claims.

ii.    One abandoned 5/11/2017 because Mr. Page failed to respond to a restriction requirement.

iii.    One abandoned 9/8/2016 because Mr. Page failed to pay the filing fee and describe the drawings properly in the specification.

b.    The assignments by Mr Page for the other two patent applications turned out to have other issues and as a result, Mr. Kendrick was unable to use a power of attorney to review them.  Mr. Kendrick eventually learned that those two patent applications had also been abandoned by Mr. Page long before being assigned to RocketFuel.

c.    Mr. Kendrick also learned that in or around October 2014, Mr. Page had attempted unsuccessfully to revive one of the patent applications by filing a petition with the

PTO, but that on June 30, 2015, the PTO dismissed his petition.  Because the petition had been dismissed, it would be extremely difficult to revive that patent application.

        d.     Mr. Kendrick also determined that because RocketFuel did not own any of the patent applications at the time they were abandoned and because of the extended length of time that had passed since abandonment, it was unlikely that they could revive the patent applications from abandoned status.  Mr. Kendrick determined that the only way RocketFuel could protect itself would be to file new patent applications covering the same underlying inventions.  However, the new filings would not relate back to the fiing dates of the original applicatiions, putting RocketFuel at risk;

        e.     Because Mr. Page's practice was to file all of his patent applications with a non-publication request, these patent applications are not published and are not searchable on the U.S. Patent and Trademark Office website; thus, there had been no way for those associated with RocketFuel and RBI to know whether there have been intervening filings by Mr. Page assigned to others;

        f.     Relatedly, because of the manner in which Mr. Page made these filings, and because Mr. Page had until that time been the registered patent agent for his abandoned applications, there was no way for those associated with RocketFuel and RBI to know that they had been abandoned except through the due diligence of patent counsel working with Mr. Page as defendant EGS was to have done; and

        g.     Above all, Mr. Kendrick ascertained that Mr. Page had not conveyed the patent applications he said he had pending before the PTO — all referenced in the EGS securities filings and other documents — and essentially conveyed ownership of nothing of value at all to the venture.

49.     At no time before this information was learned in 2019 did Mr. Page disclose it to any of Gert Funk, Henrik Rouf, Carsten Jensen or Bennett Yankowitz, anyone associated with them or the entities with which they were affiliated which were involved in the transactions or to any other person or entity involved in the venture and transactions.

50.     As alleged above, Mr. Page at all relevant times — from before the venture began in late 2017 and until 2109 — acted alone and in secret in regard to hiding the true status of his five patent applications as being abandoned before the venture began in late 2017 (except to the extent EGS may have learned the truth, but did not disclose it).

51.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of all of the other parties to the venture and to the interests of any investor in RocketFuel and/or B4MC or RBI.

52.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of RocketFuel.

53.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of B4MC/RBI.

54.     Mr. Page himself has stated in pleadings in the Nevada litigation that in connection with his dealings with EGS in relation to the due diligence as to his patent applications, he "was necessarily on the opposing side of the transaction in question" from the plaintiffs here.

55.     In the conduct of Mr. Page in relation to these matters, he had totally abandoned the interests of RocketFuel and B4MC and of the others involved in the venture and was acting entirely for his own purposes.

56.     Mr. Page's fraud and concealment as to the true status of his five patent

applications as having been abandoned did not benefit any of those persons and entities, and to the contrary, (i) exposed each of the other parties to the venture, the investors in RocketFuel and B4MC (later RBI) and RocketFuel and B4MC (later RBI) themselves to damages and losses related to the fact that they had been misled to believe that Mr. Page had contributed actual, viable patent applications to the venture which were then disclosed and discussed as alleged above, (ii) exposed them to additional costs and (iii) damaged those parties to the extent Mr. Page acquired an interest in the companies on false pretenses and in exchange for what turned out not to have value.

57.     No part of Mr. Page's fraud benefited the other parties to the venture, the investors in RocketFuel and B4MC (later RBI) or RocketFuel and B4MC (later RBI) themselves.

58.     Had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud, they could and would have stopped him from proceeding with it, and stopped him from acquiring shares in RocketFuel and shares in B4MC.

59.     Additionally, had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud before the reverse acquisition transaction, they could and would have taken steps immediately at the time to ensure that Mr. Page could not continue to participate as an owner of RocketFuel or in the venture the parties had conceived.

60.     Additionally, had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud before the reverse acquisition transaction, they would have taken steps immediately at the time to ensure that Mr. Page could not use his shares of RocketFuel to exchange them for shares in B4MC.

61.     By reason of EGS's failure to discover the fact that the Page patent

applications had been abandoned, Mr. Page walked away with the ownership interest he did, at the expense of all others involved, as the direct and proximate cause of EGS's failure.

E. *EGS's Due Diligence Duty and Its Own Failure or Fraud*

62.     EGS commenced the due diligence effort with regard to the Page patents essentially immediately after being engaged.  EGS knew at all times before the reverse merger transaction and until the truth emerged in 2019 that no one among the others involved was aware that the Page patent applications had been abandoned well before 2018.

63.     For example, on March 26, 2018, Henrik Rouf provided copies to EGS of purported assignments of the patent applications to RocketFuel.

64.     It became apparent that the assignments were defective.

65.     EGS took steps toward addressing this as a part of its due diligence work with regard to the patent applications.

66.     This was remedied in part, but not in full, under EGS's supervision.

67.     EGS and Page were put in direct contact with each other.  At that point, at least five EGS attorneys — senior partner Barry Grossman, patent attorney John Stellabotte, Sarah E Williams, Jessica Yuan and Linda Kalayjian — were involved in the work, with the latter four being part of the dialogue about the Page patent applications.

68.     Mr. Rouf continued in communication with Mr. Stellabotte about the patent applications in the months that followed.

69.     According to allegations made by Mr. Page elsewhere, in the Nevada litigation, he was in fact subjected to a "detailed examination" by EGS about the "patent portfolio" at the instruction of B4MC (through Mr. Yankowitz, who was at the time the sole Director and President of B4MC):

"Mr. YANKOWITZ instructed ELLENOFF to perform due diligence analysis for the benefit of PLAINTIFFS.  In response to YANKOWITZ's instructions, ELLENOFF conducted detailed examination of PAGE and particularly the patent portfolio for the benefit of PLAINTIFFS.  ELLENOFF reported to PLAINTIFFS and YANKOWITZ on their findings and PLAINTIFFS paid ELLENOFF for this work."[3]

70.    Mr. Page has stated similarly that Mr. Yankowitz "himself explicitly instructed [Mr. Page] to cooperate with IP specialist attorney Steven Keefe of EGS — Plaintiffs' counsel in the due diligence investigation."

71.    In the same filing, Mr. Page stated in a Declaration that an EGS attorney "represented" to him "that he was performing a [sic] intellectual property review on behalf of" both of B4MC and RocketFuel, and that the inquiries made were "rigorous examination," "including both telephonic personal interviews and extensive written questionnaire type surveys … ."  Mr. Page did in fact provide copies of examples of such written inquiries from EGS.

72.    EGS did in fact have the duty to perform the necessary due diligence as to the Page patent portfolio for the benefit of RocketFuel and, as alleged more fully below, also for the benefit of B4MC.

73.    Mr. Page has filed a pleading in the Nevada case (a copy of Page's brief dated February 8, 2021, supporting that motion is Exhibit B) in which he states in substance that he had disclosed the deficiencies in the patent applications to EGS, including during EGS's due diligence work.

74.    For example, at p. 10, Page states:

"ELLENOFF IP specialist attorney Steven Keefe reviewed directly with PAGE in telephonic interview, among other things, the specific question of abandonment of the applications and the viability of reviving the applications to normal examination process.  PAGE fully submitted to Attorney Keefe's examination without reservation whatever and fully disclosed all issues relating

---

[3] For the avoidance of doubt, plaintiffs allege specifically that they did not receive such report from EGS that the patent applications in question had been abandoned.

to the patent applications.  At that time, PAGE transmitted to RocketFuel and their attorney Keefe the *entire* patent record (IFW) of all transactions in the USPTO for all five applications."

(Emphasis in original.)

75.    On p. 19, Page alleges:

"Further for precision, ELLENOFF *specifically* assigned their intellectual property specialist attorney Stephen L. Keefe to carefully review the matter on behalf of [RocketFuel and B4MC] and directly interview PAGE with *specific regard* to patent application abandonment, revival, and assignment.

"As part of Keefe's investigation, PAGE transmitted directly to him, the full Image File Wrappers for all five patent applications.  Attorney Keefe did diligently perform this review, and the review included follow-up conversations with PAGE.

"These conversations were specific and detailed, and they were primarily directed to the topics of abandonment of the applications and the intention of the Company to revive them as provided by the normal examination rules of the Patent Office.  These conversations between PAGE and Plaintiffs' attorney Keefe additionally included specific discussion about the viability of assignments done for abandoned applications."

(Emphases in original.)

76.    In his related Declaration also filed on February 8, 2021 (a copy is part of

Exhibit B), at pp. 24-25, Page states:

"5)  I, Joseph Page, as owner of certain intellectual property, conveyed by assignment five patent applications to RocketFuel Blockchain Company in anticipation of the transaction.

"6)  In cooperation with Ellenoff Grossman & Shole specialist intellectual property attorney Stephen L. Keefe, I submitted to his review and examination and provided to him all things asked of me.

"7)  Interviews with Attorney Keefe included detailed personal telephonic interviews, and additionally written matter related to prosecution of said patent applications.

"8)  Specifically, I downloaded from the USPTO a current copy just prior to transmission of same to Mr. Keefe.  I transmitted by electronic mail a full, complete and unedited copy of the Image File Wrapper document from the

United States Patent and Trademark Office for each patent application subject of the agreement.

"9)  Further, I was examined via telephonic interview by Attorney Keefe with specific regard to patent application abandonment, viability of the applications through 'revival', and further assignment of applications is [sic] such condition."

77.     Page has made similar statements in other correspondence and pleadings.

78.     The crux of Page's defense in that case is that he had revealed his fraudulent assignment of the abandoned patent applications — the basis for his receipt from RocketFuel of ownership in it and his later trade of his ownership in RocketFuel for an ownership interest in B4MC/RBI as part of the venture that the principals discussed commencing in late 2017 and consummated as the first step in the formation of the business with the reverse acquisition transaction in June 2018 — to EGS.

79.     RocketFuel (and B4MC/RBI or any other person or party associated with them) were not apprised of those facts by Page or by EGS.

80.     RocketFuel (and B4MC/RBI) relied upon EGS to ascertain any facts of that sort in its due diligence work.

81.     If EGS knew — whether from Page or its other due diligence work — and intentionally did not disclose these facts to RocketFuel (and B4MC/RBI or any other person or party associated with them), it was complicit in fraudulent activity by Page to the direct detriment and direct harm of RocketFuel (and also to B4MC/RBI) and others.

82.     From Page's allegations, if true, EGS knew about the deficiencies in the patent applications prior to the closing of the reverse acquisition transaction in June 2018, and yet made no attempt to disclose the deficiencies or Page's admission, including of fraud, to RocketFuel (and B4MC/RBI or any other person who would face harm from those deficiencies).

83.     If EGS did not actually know about the deficiencies in the patent

applications, it was negligent, and had violated its duty of care in performing due diligence, and

not actually ascertaining the truth as to the condition of the patent applications and/or not taking

action upon that knowledge by disclosure to RocketFuel (and B4MC/RBI or any other person

who or which would face harm from those deficiencies as otherwise alleged herein) — all in a

manner inconsistent with the standard of care for attorneys performing similar work in similar

circumstances and in the same relevant jurisdiction and locations.

84.     RocketFuel was damaged by EGS's intentional failure to disclose, or else

by its negligent failure to discover or negligent failure to disclose, as alleged above.

85.     For example, EGS made no attempt to advise RocketFuel of the true status

of the patent applications as abandoned and deficient so as to permit and enable RocketFuel to

void and/or avoid delivery of valuable shares in RocketFuel to Page.

86.     EGS also did not disclose the true status of the patent applications as

abandoned and deficient in the contribution agreement for the reverse acquisition transaction,

even though EGS drafted the contribution agreement for the parties to consummate the reverse

acquisition transaction in June 2018, and the contribution agreement EGS drafted is replete with

provisions predicated upon the assumption that Mr. Page's five patent applications had been

valid and viable (for example, §§ 4.12, 5.1 and 6.5), and the general premise that the patent

applications were not abandoned but in fact being advanced by Mr. Page, as registered patent

agent.

87.     As of June 27, 2018, RocketFuel became a subsidiary of B4MC (now,

RBI), and EGS provided legal services to B4MC/RBI to draft B4MC/RBI's SEC filings, as

contemplated by the Engagement Agreement.

88.     The Super 8-K, prepared by EGS and filed on June 29, 2018, and the

subsequent 10-Ks and 10-Qs that were drafted by EGS, did not contain any disclosure of the

patent applications as abandoned and deficient.

89.     To the contrary, the Super 8-K drafted by EGS for B4MC identified the

five abandoned patent applications as if they had not been abandoned:

> "Our technology is covered by five applications for U.S. patents.  Each
> application was submitted by our Chief Technical Officer ('CTO') and director,
> Joe Page, who assigned then to RocketFuel in exchange for his RocketFuel
> shares."

90.     EGS never informed RocketFuel (or B4MC (now, RBI) or any other

person who would face harm from those deficiencies) of any deficiencies in the patents.

91.     As a direct and proximate and "but for" cause of EGS's errors and

omissions alleged herein, RocketFuel suffered damage in innumerable ways, beginning with

value it conveyed to Page that it would not have had it been properly informed and in all of the

ways it has had to take extensive and costly remedial steps after learning of the true condition of

the patent applications; and B4MC/RBI has similarly suffered such damages as a "but/for" direct

and proximate cause of EGS's errors and omissions alleged herein.

92.     And above all, as a direct and proximate cause of EGS's intentional and/or

negligent misconduct, Page has been able to walk away with value of his shares.  Those shares

were priced at the time of the closing of the reverse acquisition transaction at $9.00 per share —

the closing market price of those shares quoted at that time on the OTC Pink sheets — with a

total value in excess of $45,000,000 at that time, and in an amount in excess of $11,000,000 as of

the filing of this case, all in exchange for conveyance of nothing and (certainly without

conveyance of what was understood by all involved to have been the subject of his conveyance

and the basis for his receiving value).

93.     Plaintiffs cannot know whether EGS is liable for merely misfeasance in

not discovering the truth or malfeasance in knowing the truth and not, for whatever reason, informing plaintiffs of it.

94.     Notably, however, EGS attorney Mr. Stellabotte, with a copy to Mr. Rouf, wrote to Mr. Page by email on April 2, 2018, pointing out that the patent application files are not publicly available on the PTO website and requested the full file histories as part of EGS's due diligence effort.  More than a year later, on August 21, 2019, Mr. Stellabotte, through his partner Mr. Grossman, transmitted such files as he then claimed were obtained by EGS in its due diligence, yet stating that the complete files needed had not been obtained from Mr. Page:

> "The documents we received are attached.  We never received complete files from Joe Page as we requested.  Just these documents."

95.     The files transmitted in August 2019 by Mr. Stellabotte ― transmitted then for the first time to anyone associated with plaintiffs (other than Mr. Page) ― were the full IFWs, including the critical information as to the abandonment of the patents applications.

96.     By reason of the foregoing, EGS is liable to plaintiffs for negligence and legal malpractice, gross negligence and wanton and reckless conduct, breach of contract and breach of fiduciary duty (including being liable to RBI for its damages for the following reasons alleged).

F.  *Facts as to the Liability of EGS to B4MC/RBI*

97.     RBI makes the following allegations as to the liability of EGS to RBI in connections with the matters at issue.

98.     EGS represented B4MC/RBI in connection with the matters at issue based upon terms of the retainer agreement (Exhibit A), with an expectation it would also represent B4MC/RBI after consummation of the reverse acquisition transaction and after B4MC/RBI became an affiliate of RocketFuel.

21

99.    EGS has liability to RBI for negligence and legal malpractice and the other claims alleged herein under what is sometimes called the "privity" or "approaching-privity" standard, because (i) EGS was aware that its work, including its due diligence work as alleged herein, was to be used by B4MC (and those associated with it) for the particular purpose of evaluating transactions with Joseph Page relating to the patent applications at issue; (ii) EGS knew that there would be and that there was in fact reliance by B4MC (and those associated with it) on EGS's work in that regard and its communications of its findings and of the results of that work, with B4MC being a party known to be among those receiving such information and relying upon it in evaluating the results of the due diligence work for which EGS had been retained by RocketFuel as pertinent to evaluating the reverse acquisition transaction; and (iii) EGS, through its conduct and communications with RocketFuel (and B4MC and those associated with it) demonstrated its understanding and knowledge and connection to B4MC insofar as B4MC would be a party relying upon such information (including through those associated with it) and EGS's work and conduct demonstrated its understanding of that reliance.

100.    Additionally, as alleged above, according to allegations made by Mr. Page elsewhere, in the Nevada litigation, he was in fact subjected to a "detailed examination" by EGS about the "patent portfolio" at the instruction of B4MC (through Mr. Yankowitz, who was at the time the sole Director and President of B4MC):

> "Mr. YANKOWITZ instructed ELLENOFF to perform due diligence analysis for the benefit of PLAINTIFFS.  In response to YANKOWITZ's instructions, ELLENOFF conducted detailed examination of PAGE and particularly the patent portfolio for the benefit of PLAINTIFFS.  ELLENOFF reported to PLAINTIFFS and YANKOWITZ on their findings and PLAINTIFFS paid ELLENOFF for this work."[4]

---

[4] For the avoidance of doubt, plaintiffs allege specifically that they did not receive such report from EGS that the patent applications in question had been abandoned.

101.    Mr. Page has stated similarly that Mr. Yankowitz "himself explicitly instructed [Mr. Page] to cooperate with IP specialist attorney Steven Keefe of EGS — Plaintiffs' counsel in the due diligence investigation."

102.    In the same filing, Mr. Page stated in a Declaration that an EGS attorney "represented" to him "that he was performing a [sic] intellectual property review on behalf of" both of B4MC and RocketFuel.

103.    EGS did in fact have the duty to perform the necessary due diligence as to the Page patent portfolio for the benefit of both B4MC and RocketFuel.

## FIRST CLAIM FOR RELIEF
### (Negligence and Legal Malpractice)

104.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

105.    EGS's conduct as alleged herein breached the applicable standard of care in the exercise of an attorney's professional duties as EGS owed it to RocketFuel and to B4MC/RBI so as to constitute negligence by an attorney and legal malpractice and was in fact gross negligence and wanton and reckless conduct.

106.    Those breaches were the direct and proximate and "but for" cause of damages to RocketFuel and to B4MC/RBI, including the actual and financial damages alleged herein.

107.    By reason of and as a result of the negligence by an attorney and legal malpractice committed by EGS, and its gross negligence and wanton and reckless conduct, RocketFuel and B4MC/RBI have sustained and will continue to sustain financial losses and actual damage in its business.

108.    RocketFuel and B4MC/RBI are therefore entitled to recover damages

from EGS in amounts to be determined at trial as well disgorgement of the fees paid to EGS.

SECOND CLAIM FOR RELIEF
(Breach of Contract for Fees)

109.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

110.   RocketFuel and, later, B4MC/RBI, on the one hand, and EGS, on the other hand, had a valid and enforceable contract for EGS's provision of legal services.

111.   EGS's conduct herein, including in its conduct in the Claims for Relief and in the paragraphs that follow (incorporated here by reference), breached its contract and RocketFuel and B4MC/RBI are each entitled, among and in addition to other relief alleged and sought herein, to recover fees paid to EGS.

112.   RocketFuel and B4MC/RBI are therefore entitled to recover damages from EGS in an amount to be determined at trial.

THIRD CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

113.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

114.   By reason of their attorney-client relationships and other relationships as alleged herein, EGS owed RocketFuel, and also B4MC/RBI, the duties of a fiduciary.

115.   EGS breached those fiduciary duties by, among other things, failing to apprise RocketFuel (and B4MC/RBI and those associated with it) of the facts as to the status of the patent applications alleged herein.

116.   EGS also breached those fiduciary duties by, among other things, failing to apprise RocketFuel (and B4MC/RBI and those associated with it) of the facts as to the status

24

of the patent applications alleged herein, and also in its conduct in the Claims for Relief and in the paragraphs that follow (incorporated here by reference).

117.    By reason of and as a result of those breaches, RocketFuel and B4MC/RBI suffered damages, including the actual and financial damages alleged herein.

118.    RocketFuel and B4MC/RBI are therefore entitled to recover damages from EGS in amounts to be determined at trial.

119.    In addition, to the extent that EGS's conduct was willful and/or reckless and wanton and/or was of such character as would shock the conscience or otherwise warrant an award of exemplary or punitive damages in favor of RocketFuel and B4MC/RBI and against EGS, they are entitled to such award, in an amount to be determined at trial.

FOURTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

120.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

121.    In the summer of 2019, RBI, through its CFO, Bennett J. Yankowitz, requested that EGS, through its partner Jessica Yuan, provide a copy of the files of its work done on the engagement to help with its looking into issues with the Page patent applications.

122.    At around the same time, Mr. Yankowitz also let EGS know that RBI's auditors were requesting that EGS provide what is commonly known as an attorney auditor's letter (such as is discussed in the *American Bar Association Statement of Policy Regarding Lawyers' Responses to Auditors' requests for Information* (adopted in 1975)).

123.    Mr. Yankowitz was informed by EGS partner Barry I. Grossman that EGS would not provide the files or the auditor's letter unless RBI satisfied various conditions including, among others described herein, payment of all outstanding bills in the amount of

approximately $31,000.

124.    Mr. Grossman and EGS agreed with RBI that RBI would bring the open

billings current, with part to be paid immediately and part to be paid in approximately six weeks.

125.    RBI (and RocketFuel) had not asserted any claim against EGS — for any

reason at all or in the nature of legal malpractice in particular.

126.    In all of these discussions, or before them, EGS had not disclosed to RBI,

RocketFuel or anyone connected to them that any person had any reason to assert a claim against

EGS in connection with its representation or that there were any facts that would give rise to a

claim against EGS in favor of RBI, RocketFuel or anyone connected to them — for any reason at

all or in the nature of legal malpractice in particular.

127.    The amount RBI would pay EGS was not discounted from the amount

claimed and billed by EGS.

128.    But EGS then sent to RBI a set of papers titled "Settlement Agreement

and General Releases."

129.    These documents included a confession of judgment for the amount (net

of what RBI was to pay contemporaneous with signing the Settlement Agreement and General

Releases) EGS wanted to be paid before release of a copy any RBI/RocketFuel files or release of

the required auditor's letter.

130.    These documents also included a general release by RBI of all possible

claims it had against EGS through that time, though neither EGS nor the documents made any

mention to RBI, RocketFuel or anyone connected to them that there were any facts that would

give rise to a claim against EGS in favor of RBI, RocketFuel or anyone connected to them — for

any reason at all or in the nature of legal malpractice in particular.

131.    These documents' general release language purported to have RBI release all claims against EGS not only of RBI itself but also of a long list of unnamed categories of persons and entities, including shareholders, affiliates and subsidiaries.

132.    EGS had a duty to provide the requested files without demanding and without it being conditioned upon a release from RBI or anyone else.

133.    EGS had a duty to provide the auditor's letter without demanding and without it being conditioned upon a release from RBI or anyone else.

134.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not inform RBI, RocketFuel or anyone associated with them that there was a basis or possible basis for any claim by them against EGS — for any reason at all or in the nature of legal malpractice in particular.

135.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not mention to, specify to in any way or otherwise inform RBI, RocketFuel or anyone associated with them that the Settlement Agreement and General Releases it drafted and provided and demanded from RBI would release any claim in the nature of legal malpractice in particular.

136.    That Settlement Agreement and General Releases itself made no reference to any claim in the nature of legal malpractice in particular.

137.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not provide full knowledge of the material circumstances known to it.

138.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not notify, promptly or at all, RBI, RocketFuel or

anyone associated with them of EGS's failure or even possible failures in performance that could give rise to claims or possible claims against EGS.

139.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not notify, promptly or at all, RBI, RocketFuel or anyone associated with them, or provide any information so as to give them a full understanding of the nature of and effect as to the malpractice as alleged herein of any possible purported release.

140.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not advise RBI, RocketFuel or anyone associated with them, in writing or at all, of the desirability for them of seeking the advice of independent legal counsel in connection with the Settlement Agreement and General Releases and/or of issues giving rise to potential malpractice claims against EGS and did not give them a reasonable opportunity to seek such advice, at all, much less based upon the pertinent facts as to possible claims against EGS as alleged herein.

141.    At all times leading to and at the time of the execution of the Settlement Agreement and General Releases, EGS was a fiduciary to RBI and to Rocket Fuel.

142.    Throughout all times relevant, RBI and RocketFuel had not even ceased to be a client of EGS, as confirmed by the EGS's eventual transmittal of the required auditor's letter.

143.    Under the circumstances and duress described herein — including the facts that without the auditor's letter from EGS, RBI's auditors could not release RBI's annual financial statement, RBI could not file its annual report (10-K) with the SEC and EGS's refusal to provide the auditor's letter was already making RBI late in filing the 10-K — RBI signed the

28

Settlement Agreement and General Releases and related papers on or about August 20, 2019, as did EGS through its partner, Barry I. Grossman.

144.     In fact, the Settlement Agreement and General Releases itself states at its ¶2 that (i) EGS would only release the auditor's letter upon receipt of the Settlement Agreement and General Releases and the first payment to EGS provided for therein and (ii) EGS would only release any client files upon the receipt of the second payment provided for therein even though it was also subject to a confession of judgment.

145.     EGS's conduct, and in particular the releases it obtained in the Settlement Agreement and General Releases it extracted, violated numerous rules governing attorney conduct, including without limitation The New York Rules of Professional Conduct for attorneys at 22 NYCRR Part 1200, including without limitation Rules 1.4, 1.8 and 3.4, and the extensive decisional law and relevant ethics opinions as to attorney conduct in this regard, as well as its obligations as a fiduciary, and as a consequence, the releases obtained in the Settlement Agreement and General Releases are void and EGS may not assert or rely upon them.

146.     Ironically, after RBI's execution of the Settlement Agreement and General Releases and transmittal of the first contemplated payment, EGS admitted facts reflecting some of its knowledge of some of its failures in due diligence which had not been known to RBI/RocketFuel or anyone associated with them or theretofore disclosed to them by EGS, in an email from one of its partners John Stellabotte, transmitted to and through its partner Barry Grossman.

147.     By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such

release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

FIFTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

148.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

149.    By reason of the foregoing, EGS extracted the release in the Settlement Agreement and General Releases, and the Settlement Agreement and General Releases itself, by unlawful and improper duress, including EGS's improper and unlawful conduct in that EGS had no right to make the demands that it did before releasing client files to RBI or issuing the auditor's letter, and RBI faced serious and irreparable harm if it did not obtain its files to assess the patent issues and the auditor's letter to meet its audit requirements because it could not obtain what it needed except through EGS (or otherwise make itself whole by means available to it).

150.    By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

SIXTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

151.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

152.    By reason of the foregoing circumstances, the Settlement Agreement and General Releases was obtained by EGS without consideration.

153.    By reason of the foregoing circumstances, the release in the Settlement Agreement and General Releases was obtained by EGS without consideration.

154.    By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against defendant EGS as follows:

a.    on the First Claim for Relief, for negligence by an attorney and legal malpractice in an amount to be determined by the Court not less than $75,000 and as alleged herein and to be proven at trial;

b.    on the Second Claim for Relief, for breach of contract for fees in an amount to be determined by the Court and as alleged herein and to be proven at trial; and

c.    on the Third Claim for Relief, for breach of fiduciary duty, in an amount to be determined by the Court and as alleged herein and to be proven at trial, including exemplary or punitive damages as allowed by law;

d.    on the Fourth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein;

e.    on the Fifth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein; and

f.    on the Sixth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein;

together with costs, attorneys' fees and interest all in the fullest amount allowed at law on each such claim and together with such other and further relief for plaintiffs and against defendant

Ellenoff Grossman & Schole LLP as the Court may deem just and proper.

Dated:  June 18, 2021

SCAROLA ZUBATOV SCHAFFZIN PLLC

By _____
           Richard J.J. Scarola
*Attorneys for Plaintiffs*
1700 Broadway — 41st Floor
New York, NY  10019
Tel.:  (212) 757-0007