UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROCKETFUEL BLOCKCHAIN COMPANY
and ROCKETFUEL BLOCKCHAIN, INC.,

                    Plaintiffs,

        -against-

ELLENOFF GROSSMAN & SCHOLE LLP,

                    Defendant.

21 Civ. 1764 (VEC)

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10022
(212) 880-3800

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF RELEVANT ALLEGATIONS ...................................................... 4

    A.  Page, Funk, and Yankowitz Devise Plan for Reverse Merger............................ 4

    B.  RBC Retains EGS to Represent It In The Reverse Merger ............................... 7

    D.  Page Leaves RBI and Plaintiffs Sue Page and EGS ........................................ 9

ARGUMENT ............................................................................................................... 10

    I.   MOTION TO DISMISS LEGAL STANDARD.................................................. 10

    II.  THE *IN PARI DELICTO* DOCTRINE BARS PLAINTIFFS' CLAIMS ........................ 11

    III. PLAINTIFFS FAIL TO STATE A LEGAL MALPRACTICE CLAIM.......................... 15

        A.  EGS Cannot be Negligent for Failing to Disclose Information That
            Was Known By RBC Prior to EGS' Engagement ...................................... 15

        B.  There was No Attorney-Client Relationship Between EGS and RBI........................ 16

        C.  Proximate Cause is Utterly Absent ........................................................... 18

        D.  Plaintiffs Fail to Allege Actual Damages ................................................. 20

    IV. THE BREACH OF CONTRACT AND FIDUCIARY DUTY CLAIMS
        ARE DUPLICATIVE OF THE DEFICIENT LEGAL MALPRACTICE
        CLAIM........................................................................................................... 23

    V.  THE DECLARATORY JUDGMENT CLAIMS FAIL TO SATISFY THE
        CASE AND CONTROVERSY STANDARD ................................................. 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ableco Fin. LLC v. Hilson*,
    109 A.D.3d 438 (1st Dep't 2013) ........................................................................16

*Allco Fin. Ltd. v. Klee*,
    861 F.3d 82 (2d Cir. 2017).................................................................................10

*Allegrino v. Ruskin Moscou Faltischek, P.C.*,
    2021 WL 429121 (S.D.N.Y. Feb. 8, 2021).........................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................10

*Barrett v. Goldstein*,
    161 A.D.3d 472 (1st Dep't 2018) ......................................................................24

*Calderon v. Ashmus*,
    523 U.S. 740 (1998).........................................................................................24

*Cobalt Multifamily Invs. I, LLC v. Shapiro*,
    857 F.Supp.2d 419 (S.D.N.Y. 2012).................................................................15

*Collins v. Felder*,
    785 F.App'x 8 (2d Cir. 2019) ......................................................................15, 18

*HD Supply Facilities Maint., Ltd. v. Bymoen*,
    125 Nev. 200 (2009) ........................................................................................13

*In re Amerco Derivative Litig.*,
    127 Nev. 196 (2011) ...........................................................................12, 13, 14

*In re Arctic Glacier Int'l, Inc.*,
    2016 WL 3920855 (Bankr. D. Del. July 13, 2016), *aff'd*,
    255 F.Supp.3d 534 (D. Del. 2017), *aff'd*, 901 F.3d 162 (3d Cir. 2018) .................22

*In re ICP Strategic Income Fund, Ltd.*,
    730 F.App'x 78 (2d Cir. 2018) .........................................................................12

*Janker v. Silver, Forrester & Lesser, P.C.*,
    135 A.D.3d 908 (2d Dep't 2016)......................................................................20

*Katsoris v. Bodnar & Milone, LLP*,
    186 A.D.3d 1504 (2d Dep't 2020) ..................................................................20, 23

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ...........................................................................11, 12, 14

*Knox v. Aronson, Mayefsky & Sloan, LLP*,
    168 A.D.3d 70 (1st Dep't 2018) ......................................................................18, 24

*Learning Annex, L.P. v. Blank Rome LLP*,
    106 A.D.3d 663 (1st Dep't 2013) .........................................................................17

*Leggiadro, Ltd. v. Winston & Strawn, LLP*,
    119 A.D.3d 442 (1st Dep't 2014) .........................................................................16

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..................................................................................10

*McGuire v. Russell Miller, Inc.*,
    1 F.3d 1306 (2d Cir. 1993)....................................................................................23

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)..................................................................................23

*MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*,
    701 F.Supp.2d 518 (S.D.N.Y. 2010), *aff'd*, 410 F.App'x 408 (2d Cir. 2011)........23

*O'Melveny & Myers v. F.D.I.C.*,
    512 U.S. 79 (1994)................................................................................................12

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003)..................................................................................12

*Perkins v. Perkins*,
    226 A.D.2d 610 (2d Dept. 1996) ..........................................................................18

*S.E.C. v. Boock*,
    2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011)......................................................22

*Siwiec v. Rawlins*,
    103 A.D.3d 703 (2d Dept 2013) ...........................................................................18

*Sofi Classic S.A. de C.V. v. Hurowitz*,
    444 F.Supp.2d 231 (S.D.N.Y. 2006)....................................................................25

*Stolmeier v. Fields*,
    280 A.D.2d 342 (1st Dep't 2001) .........................................................................19

*Superior Tech. Sols., Inc. v. Rozenholc*,
  147 A.D.3d 485 (1st Dep't 2017) .........................................................................20

*The Learning Annex, L.P. v. Blank Rome LLP*,
  2012 WL 6629886 (Sup. Ct. N.Y. Co. Nov. 19, 2012), *aff'd*
  106 A.D.3d 663 (1st Dep't 2013) .........................................................................17

*USACM Liquidating Tr. v. Deloitte & Touche LLP*,
  764 F.Supp.2d 1210 (D. Nev. 2011), *aff'd sub nom.*
  754 F.3d 645 (9th Cir. 2014) ................................................................12, 13, 14

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
  890 F.Supp.2d 398 (S.D.N.Y. 2012).......................................................................24

*Village Builders 96, L.P. v. U.S. Lab., Inc.*,
  121 Nev. 261 (2005) ..............................................................................................13

*Wadsworth Condos, LLC v. 43 Park Owners Group, LLC*,
  55 Misc. 3d 1206(A), 55 N.Y.S.3d 695 (Sup. Ct., N.Y. Co., 2016).......................18

**Statutes**

28 U.S.C. § 2201.............................................................................................................24

Fed. R. Civ. P. 12(b)(6)...................................................................................................10

Defendant Ellenoff Grossman & Schole LLP ("Defendant" or "EGS") submits this Memorandum of Law in support of its motion to dismiss, with prejudice and without leave to replead again, the Second Amended Complaint ("SAC") filed by Plaintiffs Rocketfuel Blockchain Company ("RBC") and Rocketfuel Blockchain, Inc. ("RBC" and "RBI," collectively, "Rocketfuel," "Plaintiffs"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Mired in an internal boardroom dispute in Nevada[1] with its co-founder, former director and chief technical officer, Joseph Page ("Page"), Plaintiffs complain here that RBC's former attorneys, EGS, kept information pertaining to the "abandoned" status of Page's five patent applications hidden from them, resulting in losses. But in Nevada, Plaintiffs allege that their losses stem from a different cause: that Page knew and allegedly fraudulently withheld the true status of the patent applications from them. These claims are irreconcilable. Plaintiffs cannot demonstrate that EGS breached a duty to inform RBC's *other officers* of information that they admit Page knew but withheld from them or that Plaintiffs' alleged losses were proximately caused by EGS. Plaintiffs' second attempt to replead does not (and cannot) rectify the fundamental inconsistency in its allegations and fail to state a claim of malpractice.

In response to Rocketfuel's allegations in the Nevada Action, Page has counterclaimed, alleging that, as early as December 2017 – long before EGS was ever retained by RBC – he fully disclosed to RBC's president, Gert Funk ("Funk") and others that his patent applications were abandoned. Page further alleges that Funk and others agreed to promptly raise millions in new capital to revive those applications and file new ones but, instead, engaged in various internal

---

[1]     *Rocketfuel Blockchain, Inc., et al. v. Joseph Page*, 2:21-cv-00103-KJD-ELY (D. Nev.) (the "Nevada Action").

"scams" to enrich themselves.  After learning recently that Plaintiffs commenced this action against EGS, Page observed that Plaintiffs' claims of liability against EGS for acts known to Plaintiffs were "wrong[]."  That assessment, made from one who would know, was correct; at its core, this is an internal dispute between Page and his former business partners.  Plaintiffs' claims that they relied on EGS to advise them about facts Page knew cannot be sustained.

The SAC, containing six claims for relief, must be dismissed in its entirety under the well-established *in pari delicto* doctrine.  Prior to EGS' engagement, Page, Funk, and Bennett Yankowitz ("Yankowitz"), a lawyer and the President of B4MC (later renamed RBI), devised a plan for Page and Funk to form RBC.  As part of that plan, Page agreed to assign his five patent applications to the soon-to-be-formed company.  Once formed, the plan provided that RBC would be merged into an existing, publicly traded shell company then-known as B4MC.  That plan was detailed in a letter of intent, signed by the three individuals on January 8, 2018.  Pursuant to the letter of intent, on January 12, 2018, Page and Funk formed RBC, to which Page assigned the patent applications.  After EGS was retained in March 2018, the plan conceived by Page, Funk, and Yankowitz was memorialized in a contribution agreement drafted by EGS.

As an owner, director and officer of RBC from its inception, Page's knowledge about the status of the patent applications was imputed to RBC well before EGS was ever engaged.  In substance, RBC's shareholders (including Page and Funk) were the true purchasers in the merger; they acquired a 75% ownership stake in RBI and conveyed to themselves (as officers and directors in RBI) all of RBC's rights and liabilities, including the assigned patent applications.  Thus, Page's knowledge regarding the status of the patent applications he assigned to RBC followed him to RBI and is imputed to it.  In these circumstances, the law bars Plaintiffs from imposing liability on EGS

for failing to advise them of facts relating to the patent applications that were known to Page as an officer of Plaintiffs and thereby imputed to them.

The SAC should be dismissed for four other straightforward reasons.  First, EGS cannot be negligent for failing to discover or disclose the abandoned status of the patent application because (as Plaintiffs alleged in Nevada) Page knew those facts at the time he was an officer of Rocketfuel.  Page's alleged failure to disclose that information to Funk, Yankowitz, or others at Rocketfuel is a matter for determination in the Nevada Action.[2] Here, that determination is besides the point; EGS owed no duty to Rocketfuel to inform each of its individual officers what it alleges Page already knew: that the patent applications had been abandoned and may not be revivable.

Second, RBI's claims fail because there was no attorney-client relationship between it and EGS.  As *RBC's merger counsel*, EGS did not undertake to represent RBI prior to the merger. Plaintiffs' claim that the merger retroactively transformed EGS into RBI's counsel is without basis. Third, Plaintiffs cannot show that their damages are the "but for" result of EGS's alleged negligence because their allegations of fraud against Page in the Nevada Action preclude them from demonstrating in this action that EGS's conduct is the proximate cause of their alleged losses. Furthermore, even if Plaintiffs claims here and in Nevada could, somehow, be reconciled, no proximate causation could be shown because the agreement to merge RBC into RBI was reached before EGS was ever retained.  Fourth, Plaintiffs' allegations fail to allege facts demonstrating the

---

[2]     The evidence strongly suggests Rocketfuel was aware that the patent applications were tenuous.  In its Audited Financial Statements, Rocketfuel stated the applications had no assigned value.  *See* Touitou Decl. Ex. 7.  In addition, in July 2018 on the day of the merger, Rocketfuel advised EGS that the "patents are not critical to the business" and as of the day of the merger, "the patent position is not critical and RocketFuel will be able to proceed identically as if they did not have any patents."  Touitou Decl. Ex. 4.

existence of actual damages.  The value of the shares assigned to Page in alleged consideration for his assignment of the patent applications were, and are, entirely speculative.

Plaintiffs' other claims sounding in breach of contract and breach of fiduciary duty are duplicative of their deficient legal malpractice claim. Those claims should be dismissed.  Further, Plaintiffs' three declaratory judgment claims are deficient because they fail to satisfy the case or controversy standard.  Accordingly, and as set forth in more detail below, the SAC fails to meet the plausibility standard and must be dismissed, with prejudice and without leave to replead again, pursuant to Fed.R.Civ.P. 12(b)(6).

## STATEMENT OF RELEVANT ALLEGATIONS[3]

### A.   Page, Funk, and Yankowitz Devise Plan for Reverse Merger

Page, a member of the USPTO patent bar and registered patent agent, is a computer science and blockchain technologies inventor who has participated in the founding of several technology companies since 1989.[4]  Funk has been a serial entrepreneur since 1990 with experience and specialty in banking and payments processing, having been a director and officer of various companies in that sector.[5]  Yankowitz, who is Senior Of Counsel at Shumaker Mallory LLP, a law firm based in Los Angeles, was the President and sole Director of the publicly traded shell company, BM4C.[6]

---

[3]     The relevant allegations are taken from SAC and documents incorporated by reference therein.  *See* Declaration of Philip Touitou, dated July 14, 2021 ("Touitou Decl.") Ex. 1 (SAC).

[4]     *See* Toutiou Decl. Ex. 5 (Form 8-K of B4MC, dated June 29, 2018, which is referenced in paragraphs 19 and 88 of the SAC ("Super 8-K")) p. 26.

[5]     *Id.*

[6]     *See* Touitou Decl. Ex. 1 (SAC) ¶¶7-8 and Ex. 6 (Contribution Agreement by and among B4MC, as purchaser and RBC, as company, and Gert Funk, Joseph Page, PacificWave Partners Limited, PacificWave Partners UK Ltd. and Saxton Capital Ltd. as Sellers, dated as of June 27,

On January 8, 2018, Page, Funk, and Yankowitz executed a letter of intent, titled "Proposal Regarding Rocketfuel" (the "LOI"), detailing their plans for a proposed reverse merger transaction, in the hopes of developing highly efficient check-out systems for eCommerce based upon blockchain technology.[7]  The LOI provided that Page and Funk would form RBC, with Funk and Page owning 90% and an investor owning the remaining 10%, and that Page would transfer his "patents, intellectual property and other assets" to the company.[8]  The reverse merger negotiated by Page, Funk, and Yankowitz entitled the shareholders of RBC to transfer 100% of their shares in RBC for 75% of the total outstanding common stock of B4MC.[9]  Thus, as a result of the merger, RBC would become a 100% wholly-owned subsidiary of B4MC, but the owners of RBC would gain control of B4MC, with Page becoming Chairman of the Board of Directors and Chief Technical Officer and Funk becoming Chief Executive Officer.[10]  Yankowitz would be the third member of the Board of Directors, as well as Chief Financial Officer and Secretary.[11]

---

2018 ("Contribution Agreement"), which is referenced in paragraphs 19 and 86 of the SAC, and is Exhibit 2.1 to the Super 8-K filed with the SEC) p. 27.

[7]     *See* Touitou Decl. Ex. 3 (LOI); *see also* Touitou Decl. Ex. 7 (RBC Audited Financial Statements as of March 31, 2018 and the Period from January 12, 2018 (date of inception) through March 31, 2018, which is Exhibit 99.1 to the Super 8-K filed with the SEC) ("RBC Audited Financial Statements") F-6.

[8]     Touitou Decl. Ex. 3 (LOI), p.1.

[9]     *See id.*, p.2; *see also* Touitou Decl. Ex. 6 (Contribution Agreement), Recitals A and B; *see also* Ex. 1 (SAC) ¶¶6, 19, 21.

[10]    *See* Touitou Decl. Ex. 3 (LOI) p.3; *see also* Toutiou Decl. Ex. 5 (Super 8-K) pp. 4, 26.

[11]    *See* Touitou Decl. Ex. 3 (LOI) p.3; *see also* Toutiou Decl. Ex. 5 (Super 8-K) p. 26.

Pursuant to the LOI, on January 12, 2018, Page and Funk formed RBC, a Nevada private corporation.[12]  Page became RBC's Treasurer and Funk its President.[13]  Also pursuant to the LOI, on January 12, 2018, Page assigned his five patent applications to RBC in exchange for shares of the company.[14]  The patent applications were RBC's only assets.[15]  RBC has disclosed in its Audited Financial Statements that "[n]o value was ascribed to the intellectual property rights since no patents have been issued *and there can be no assurance that any patents will be issued.*"[16]

On January 16, 2018, RBC executed a stock subscription agreement with a private, non-US investor and sold 100 shares of the company's $0.0001 par value common stock for $250,000 in cash, as contemplated by the LOI.[17]  In February 2018, RBC paid a non-refundable commitment fee of $250,000 to B4MC (the same amount RBC received from the non-US investor) pursuant to the LOI.[18]  The LOI provided that the $250,000 was to be used for specific payments of accounts payable and costs related to the proposed transaction.[19]

---

[12]     *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-6; *see also* Ex. 1 (SAC) ¶20.

[13]     *See* Touitou Decl. Ex. 9 (Press Release, dated June 28, 2018, announcing the closing of the reverse merger of B4MC and RBC, which is Exhibit 99.3 to the Super 8-K filed with the SEC ("Press Release")).

[14]     *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-10; *see also* Ex. 1 (SAC) ¶¶20-21.

[15]     *See* Touitou Decl. Ex. 1 (SAC) ¶20.

[16]     *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-10 (emphasis added).

[17]     *See id.*; *see also* Touitou Decl. Ex. 3 (LOI) p.1.

[18]     *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-10; *see also* Touitou Decl. Ex. 8 (B4MC Unaudited Pro Forma Combined Financial Statements, which is Exhibit 99.2 to the Super 8-K filed with the SEC ("B4MC Unaudited Financial Statements")) Notes (1)(a) and (2)(a); Touitou Decl. Ex. 3 (LOI) p.1.

[19]     *See* Touitou Decl. Ex. 3 (LOI) p.2 and Ex. 7 (RBC Audited Financial Statements) F-9.

Neither RBC nor B4MC were viable companies at the time.  RBC had reported a loss from operations of $3,805, a net loss of $253,805, a negative cash flow from operations of $250,305, and had not commenced operations.  RBC's fledgling existence prompted its auditor to refuse to opine that the company was a going concern.[20]  B4MC, a Nevada public corporation, was a shell company with no assets and no liabilities, had not conducted business since May 12, 2015, had no revenue, and the stockholders' equity in the company was a negative $137,203.[21]

B.      **RBC Retains EGS to Represent It In The Reverse Merger**

On behalf of RBC, Funk, as then-President, retained EGS to represent RBC in the reverse merger transaction and signed the Engagement Agreement, dated March 2, 2018.[22]  Specifically, the Engagement Agreement provides:

> This letter contains the terms and conditions of Ellenoff Grossman & Schole LLP's (the "Firm") agreement *to act as counsel to Rocketfuel Blockchain Company* and its affiliates (collectively the "Company") with respect to (i) the reverse merger/capital contribution of the Company into B4M Gold Mines, Inc. (the "Merger"), and ongoing corporate and securities matters for the Company following the Merger (hereinafter referred to as "Monthly Retainer Matters").

Funk executed the Engagement Agreement on behalf of RBC.[23]  BM4C is not a party to the Engagement Agreement.

As part of its pre-closing services, EGS posed a list of important questions to RBC to be answered and on June 27, 2018, Henrik Rouf, on behalf of Rocketfuel, responded by email,

---

[20]     *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-1.

[21]     *See* Touitou Decl. Ex. 6 (Contribution Agreement) §3.8; *see also* Ex. 8 (B4MC Unaudited Financial Statements) pp. 3-4.

[22]     *See* Touitou Decl. Ex. 2 (Engagement Agreement, dated March 2, 2018 between RBC and EGS, which is Exhibit A to the SAC ("Engagement Agreement")) (emphasis added); *see also* Ex. 1 (SAC) ¶¶13-14.

[23]     *Id.*

copying Yankowitz, and stated, "[a]ttached are the Company's answers to the 17 open items. Should you have any further questions, please contact Joe Page and Gert funk directly…"[24] The attachment bearing the metadata reference "answers to lawyers 27.06.2018," provides the following question and answer at the top of the second page:

### Questions
Please explain if the patents are critical to the business (and if so, please provide a brief summary describing these patents).

### Answers
*The patents are not critical to the business.* With no patents at all, RocketFuel will be first to develop and first to market – there is no competition today. After a few years, competition will be discouraged from entry into this area because of our patent portfolio. *But today, the patent position is not critical and RocketFuel will be able to proceed identically as if they did not have any patents.*[25]

The reverse merger transaction closed on June 27, 2018, the same day as the aforementioned email, with the execution of the Contribution Agreement.[26] In September 2018, B4MC changed its name to RBI, as originally planned in the LOI.[27] As later described in its filing with the Securities and Exchange Commission, post-merger, RBI was a start-up company whose performance would depend on the "talents and efforts" of Page and Funk as the company's "key employees … who are charged with daily operations and strategy to reach commercial success," as well as the ability to raise capital.[28]

---

[24] *See* Touitou Decl. Ex. 4 (June 27, 2018 email with an attachment named "answers to lawyers 27.06.2018," whereby RBC provided answers to 17 open items posed by EGS as part of the pre-closing services EGS performed, which is referenced in paragraph 19 of the SAC ("June 27, 2018 email and attachment"). According to the SAC, Rouf was involved in the venture and "together with Mr. Yankowitz, had the ability to bring B4MC into the venture and contemplated transaction as the publicly traded entity." Touitou Decl. Ex. 1 (SAC) ¶¶7-8.

[25] Touitou Decl. Ex. 4 (emphasis added).

[26] *See* Touitou Ex. 6 (Contribution Agreement); *see also* Ex. 1 (SAC) ¶17.

[27] *See* Touitou Ex. 1 (SAC) ¶6 and Ex. 3 (LOI) p.3.

[28] *See* Touitou Decl. Ex. 5 (Super 8-K) pp. 17, 19.

D.      **Page Leaves RBI and Plaintiffs Sue Page and EGS**

Page resigned as an officer and director of the company in May 2019.[29]  Plaintiffs allege

that subsequent thereto, they "learned" that the patent applications Page had assigned to RBC in

January 2018 (before EGS was retained) had been abandoned by Page or were otherwise

deficient.[30]  Plaintiffs allege they had "no way to learn" of these deficiencies, despite the fact that

Page was an owner and officer of RBC since its inception.[31]  As a result, Plaintiffs have sued Page

and Page has counter-sued in the Nevada Action.  That action remains pending.[32]  In a recent filing

by Page in the Nevada Action, he asserts that Rocketfuel is "wrongly" suing EGS because "from

day one" he disclosed to Funk and others that the patent applications had to be revived and/or new

applications would need to be filed.[33]

Plaintiffs commenced the instant action against EGS, alleging, *inter alia*, claims of legal

malpractice, breach of contract, and breach of fiduciary duty.[34]  Plaintiffs allege that EGS was

negligent for failing to discover or disclose the patent applications' deficiencies after conducting

due diligence for the merger and speaking with Page.[35]  Rocketfuel and EGS also had an earlier

dispute in mid-2019 concerning unpaid legal fees, which was resolved via a settlement agreement

---

[29]     *See* Touitou Decl. Ex. 1 (SAC) ¶23.

[30]     *Id.*, ¶16.

[31]     *Id.*, ¶17.

[32]     *Id.*, ¶20; *see also* Touitou Decl., Ex. 10 (Nevada Action Complaint) and Ex. 11 (Page's Nevada Action Cross-Complaint).

[33]     *See* Touitou Decl., Ex. 12 (Page Opp. to Pacificwave Partners MTD).

[34]     *Id.*, ¶¶44-59.

[35]     *Id.*, ¶¶21-27, 44-59.

containing a general release.[36]  Plaintiffs have asserted three declaratory judgment claims in this

action concerning whether EGS can use the aforementioned release as an affirmative defense.[37]

## ARGUMENT

## I.   MOTION TO DISMISS LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint should be dismissed where it fails to

"contain sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009).  The facial plausibility standard is not met where the plaintiff

fails to plead "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*  Further, "the 'plausibility' standard applies

only to a complaint's factual allegations" and, thus "legal conclusions couched as factual

allegations" are given "no effect at all."  *Mayor & City Council of Baltimore, Md. v. Citigroup,*

*Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).

"For the purpose of a motion to dismiss under Rule 12(b)(6), 'the complaint is deemed to

include any written instrument attached to it as an exhibit or any statements or documents

incorporated in it by reference.'" *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 98 n.13 (2d Cir. 2017)

(citations omitted).  Documents also entitled to consideration on a Rule 12(b)(6) motion are

"legally required public disclosure documents filed with the SEC, and documents possessed by or

known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Further, "[t]o the extent a plaintiff's allegations are

contradicted by a document attached to the complaint as an exhibit, or incorporated by reference,

or by documents that are integral to, or explicitly referenced in, the pleading, the plaintiff's

---

[36]      *Id.*, ¶¶63, 69, 83.

[37]      *Id.*, ¶¶60-94.

allegations are simply insufficient to defeat a motion to dismiss." *Allegrino v. Ruskin Moscou Faltischek, P.C.*, 2021 WL 429121, at *6 (S.D.N.Y. Feb. 8, 2021).

As detailed below, based on the factual allegations in the SAC and the documents incorporated by reference thereto, the SAC should be dismissed because:

- All Plaintiffs' claims are barred by the *in pari delicto* doctrine.

- Alternatively, Plaintiffs' claims in Count I sounding in legal malpractice fail because the SAC fails to allege facts rising above the conclusory level that:

  (i) EGS represented RBI in connection with the patent applications;

  (ii) EGS breached a duty of care to Plaintiffs to advise them concerning information Page, as an owner, director, and officer of Plaintiffs, already knew;

  (iii) Plaintiffs' losses were proximately caused by EGS's alleged failure to advise, not the fraud they allege Page committed in the Nevada Action; and

  (iv) Plaintiffs suffered actual damages from the issuance of RBI stock.

- Counts II and III for breach of contract and breach of fiduciary duty are duplicative of the deficient legal malpractice claim; and

- Counts IV through VI for declaratory judgment are deficient as they fail to satisfy the case or controversy standard.

## II.    THE *IN PARI DELICTO* DOCTRINE BARS PLAINTIFFS' CLAIMS

All of Plaintiffs' claims against EGS are barred by the *in pari delicto* doctrine, necessitating dismissal of the SAC. "The doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010). This centuries-old common law doctrine is followed throughout the country, including

Nevada, which has held that it is applicable to the corporate context.  *See In re Amerco Derivative Litig.*, 127 Nev. 196, 206 (2011).[38]

The doctrine bars claims by a corporation against third-parties for negligence, malpractice, or breach of fiduciary duty for the failure to discover or disclose wrongdoing of a corporate insider because that wrongdoing is imputed to the corporation.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d at 465; *USACM Liquidating Tr. v. Deloitte & Touche LLP*, 764 F.Supp.2d 1210, 1230 (D. Nev. 2011) (trustee, standing in shoes of bankrupt corporation, was barred by *in pari delicto* doctrine from recovering from auditor for alleged failure to discover fraud of corporation's insiders), *aff'd sub nom.* 754 F.3d 645 (9th Cir. 2014).  The doctrine is so entrenched in our jurisprudence that courts "may resolve *in pari delicto* defenses on the pleadings."  *In re ICP Strategic Income Fund, Ltd.*, 730 F.App'x 78, 82 (2d Cir. 2018); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164 (2d Cir. 2003) ("[T]his Court has affirmed the dismissal of breach of fiduciary duty claims on the pleadings upon findings that *in pari delicto* had been established in the complaints").

Pursuant to the LOI, Page, Funk, and Yankowitz devised the plan for Page and Funk to form RBC for the purpose of Page assigning his five patent applications to the soon-to-be-formed company and effectuate the merger with B4MC.  *See* Touitou Decl. Ex. 3 (LOI).  On January 12, 2018, Page assigned the applications to RBC, the same day the company was formed, and became its Treasurer.  *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-10, and Ex. 9 (Press Release).  Page's knowledge that the patent applications had been abandoned or were deficient, as

---

[38]    Nevada law governs the applicability of the *in pari delicto* doctrine in the corporate context as RBC and RBI are both Nevada corporations.  *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 84–85 (1994).

Plaintiffs allege (SAC ¶24), was imputed to RBC since its inception.  *See In re Amerco Derivative Litig.*, 127 Nev. at 214–15 ("Under basic corporate agency law, the actions of corporate agents are imputed to the corporation").  Thus, RBC's claims in the SAC are barred by the *in pari delicto* doctrine. *See USACM Liquidating Tr. v. Deloitte & Touche LLP*, 764 F.Supp. 2d at 1230.

The bar applies to RBI too.  Under Nevada law, whether via a *de jure* or *de facto* merger, all rights and liabilities of the constituent corporations are imposed on the merged entity.  *See HD Supply Facilities Maint., Ltd. v. Bymoen*, 125 Nev. 200, 207 (2009) (a *de jure* merger "imposes upon the surviving corporation all liabilities of the constituent corporations so merged") (citations omitted); *Village Builders 96, L.P. v. U.S. Lab., Inc.*, 121 Nev. 261, 268–69 (2005) (same rule for *de facto* merger).  Pursuant to the Contribution Agreement, RBC "contribute[d], transfer[ed], assign[ed] and convey[ed]" to B4MC "all rights, privileges, benefits, obligations and liabilities…" Touitou Decl. Ex. 6 (Contribution Agreement) §1.1.  In addition, Page became the Chief Technical Officer and Chairman of the Board of Directors of RBI, and Funk, the President of RBC since its inception, became CEO and Director of B4MC.  *Id.,* §8.1(d)(IV) and Ex. 9 (Press Release).  This was all in accordance with the plan Page, Funk, and Yankowitz laid out in the LOI that was negotiated before EGS was engaged by RBC.  *See* Touitou Decl. Ex. 3.

In fact, it was Page, Funk, and their investment partners, as the owners of RBC, who were the true purchasers in the merger, acquiring 75% of the total outstanding common stock of B4MC.  Post-merger, Page and Funk formed two-thirds of BM4C's Board of Directors, with Yankowitz, the President, existing sole Director and corporate lawyer, being the other Director.  *See* Touitou Decl. Ex. 6 (Contribution Agreement) Recital B, §8.1(d)(IV), and p. 27.  According to the merged company's Super 8-K, the company's performance depended on the "talents and efforts" of Page and Funk as the company's "key employees … who are charged with daily operations and strategy

13

to reach commercial success." Touitou Decl. Ex. 5 (Super 8-K) p.19.  Thus, RBC's knowledge

that the patent applications had been abandoned or were deficient, as Plaintiffs allege, was imputed

RBI (formerly known as B4MC), thereby barring any claim against EGS pursuant to the *in pari*

*delicto* doctrine.  *See USACM Liquidating Tr. v. Deloitte & Touche LLP*, 764 F.Supp. 2d at 1230.

    To side-step the *in pari delicto* doctrine, Plaintiffs' SAC attempts to bring its claims within

the "adverse interest exception".  However, the SAC's conclusory allegations that Page's interests

were "adverse" to those of his other venture partners as well as RBC and RBI fail to meet the

stringent requirements of that narrow exception.  *See* Touitou Decl. Ex. 1 (SAC) ¶¶51-53.  The

law is clear that:

> [T]he agent's actions must be completely and totally adverse to the corporation to invoke
> the exception.  Requiring total abandonment of the corporation's interest renders the
> exception very narrow … If the agent's wrongdoing benefits the corporation in any way,
> the exception does not apply. *Simply because an agent has a conflict of interest or is
> acting mostly for his own self-interest will not invoke the exception.*

*In re Amerco Derivative Litig.*, 127 Nev. at 214 (citations omitted; emphasis added); *see also*

*Kirschner*, 15 N.Y.3d at 468 ("So long as the corporate wrongdoer's fraudulent conduct enables

the business to survive—to attract investors and customers and raise funds for corporate

purposes—this test is not met").  Plaintiffs cannot allege facts demonstrating they received no

benefit from Page's assignment of the patent applications.  In its Super 8-K, RBI (then still known

as B4MC) touted the assignment of the patent applications and its relationship with Page.[39]  Those

applications served as the foundation for the Contribution Agreement and the merger that

transformed RBC into the public company that became RBI.  After Agreement and merger, Funk,

---

[39] The 8-K boasted that "[o]ur CTO, Joe Page, developed the first prototype of the Rocketfuel
blockchain based check-out solution in 2015 through 2017, based on the technology covered by
the patent applications that have been assigned to us. See '-Patents.'  Following the consummation
of the Business Combination, we intend to develop the technology to obtain proof of concept with
several larger US eCommerce merchants, social media and blog-sites."  Touitou Decl. Ex. 5, p.10.

Yankowitz and others received 14,743,834 shares in RBI.  *See* Touitou Decl. Ex. 5 (Super 8-K) p.25.  Accordingly, the adverse interest exception is wholly inapplicable.

## III.   PLAINTIFFS FAIL TO STATE A LEGAL MALPRACTICE CLAIM

Under New York choice of law rules, the law of the state where the attorney is licensed and practices law governs legal malpractice claims.  *See Cobalt Multifamily Invs. I, LLC v. Shapiro*, 857 F.Supp.2d 419, 431 (S.D.N.Y. 2012).  Accordingly, New York law governs Plaintiffs' first claim for legal malpractice as EGS is a New York law firm and performed its services in New York.  *See* Touitou Decl. Ex. 1 (SAC) ¶3; *see also* Ex. 2 (Engagement Agreement). "To prevail on a legal malpractice claim in New York, a plaintiff must demonstrate that 'that the attorney was negligent, that the negligence was a proximate cause of the injury and that [the plaintiff] suffered actual and ascertainable damages.'" *Collins v. Felder*, 785 F.App'x 8, 10 (2d Cir. 2019) (citations omitted).  The SAC fails the plausibility standard under all three elements.

### A.   EGS Cannot be Negligent for Failing to Disclose Information That Was Known By RBC Prior to EGS' Engagement

On March 2, 2018, Funk, as then-President of RBC, retained EGS to provide services in connection with the reverse merger transaction.  The engagement agreement did not include services relating to the patent applications.  *See* Touitou Decl. Ex. 2 (Engagement Agreement). EGS was engaged by RBC ***after*** Page, Funk, and Yankowitz had already planned the reverse merger transaction and Page had already assigned his patent applications to RBC and became Treasurer of the company.  *See* Touitou Decl. Ex. 3 (LOI), Ex. 7 (RBC Audited Financial Statements) F-10, and Ex. 9 (Press Release).  As such, Funk and Rocketfuel did not rely on EGS to advise them on the status of the patent applications, which they knew could be worthless.

Indeed, Rocketfuel disclosed in its Audited Financial Statements, dated June 28, 2018, that the patent applications had no value.  *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements)

F-10 ("No value was ascribed to the intellectual property rights since no patents have been issued and there can be no assurance that any patents will be issued").  In addition, on the day the merger closed, Rocketfuel emailed EGS with a list of answers to questions posed by the firm and Rocketfuel stated unequivocally, "[t]he patents are not critical to the business … [T]oday, the patent position is not critical and RocketFuel will be able to proceed identically as if they did not have any patents."  Touitou Decl Ex. 4 (June 27, 2018 email and attachment).

EGS cannot be found to be negligent for failing to discover or disclose the tenuous nature of the patent applications, because that fact was already known to RBC via Page, as evidenced by Plaintiffs' own SEC filing, and Rocketfuel informed EGS that the patents were not critical to the business.  *See, e.g. Ableco Fin. LLC v. Hilson*, 109 A.D.3d 438, 438–39 (1st Dep't 2013) (attorneys were not negligent in failing to advise plaintiff-client "on the basis of information plaintiff indisputably possessed"); *see also Leggiadro, Ltd. v. Winston & Strawn, LLP*, 119 A.D.3d 442, 442 (1st Dep't 2014) ("[T]he individual plaintiffs' history of paying pass-through taxes on the S–Corporation precludes them from reasonably relying on defendant's alleged failure to identify such liability here").

### B.   There was No Attorney-Client Relationship Between EGS and RBI

RBI has no standing to assert a legal malpractice claim against EGS.  At the time of the Engagement Agreement, dated March 2, 2018, Yankowitz, a corporate attorney, was President and sole Director of BM4C.   Neither BM4C nor Yankowitz were parties to the Engagement Agreement.   *Compare* Touitou Ex. 2 (Engagement Agreement) *with* Ex. 6 (Contribution Agreement) p.27.  Only Funk, as President of RBC, is a signatory.  *See Leggiadro, Ltd. v. Winston & Strawn, LLP*, 119 A.D.3d at 442 ("In this legal malpractice action, the individual plaintiffs, who are not identified as clients in the written retainer agreement and did not sign the retainer in an

individual capacity, failed to establish the existence of an attorney-client relationship").  In addition, the LOI, which was signed by Yankowitz, clearly states that EGS would be counsel to RBC alone.  *See* Touitou Decl. Ex. 3 (LOI), p.2.  If Yankowitz wished for EGS to represent B4MC as well as RBC, he had every opportunity to make that happen, but did not.  In the absence of an attorney-client relationship, RBI has no standing to assert a legal malpractice claim against EGS.[40]

A case on point is *Learning Annex, L.P. v. Blank Rome LLP*, 106 A.D.3d 663 (1st Dep't 2013), where the Appellate Division affirmed the dismissal of the complaint brought by one company in a merger transaction against the attorneys that represented the other company in the transaction, reasoning: "[t]he amended complaint does not allege a claim for legal malpractice in connection with defendants' representation of the alleged fraudsters in a merger transaction.  Even if such a claim were alleged, it would fail to state a cause of action in the absence of an attorney-client relationship."  *Id.*, at 663.[41]

RBI's only basis to allege an attorney-client relationship with EGS is derivative of its relationship with RBC, as the assignee of RBC's rights and liabilities in the merger.  *See* Touitou Decl. Ex. 6 (Contribution Agreement) §1.1.  However, even assuming such an assignment, RBI's claim is hamstrung by the same facts that doom RBC's legal malpractice claim:  Page's pre-existing knowledge (and alleged disclosure) of the patent applications' infirmities that was

---

[40]    To the contrary: in the context of the merger, RBI stood on the opposite side of the merger transaction to RBC, the party that *did* have an executed retainer agreement with EGS to perform corporate services relating to that transaction.  If anything, EGS was adverse to RBI for purposes of the transaction, making truly absurd RBI's claim that EGS committed malpractice by failing to disclose to RBI that RBC's assets may be worthless than RBI was prepared to pay for them.

[41]    The trial court's decision makes plain that the crux of plaintiff's claim was that the defendant law firm did not disclose a certain key document, but the trial court held that plaintiff failed to state a claim because the law firm represented the other party to the merger transaction. *The Learning Annex, L.P. v. Blank Rome LLP*, 2012 WL 6629886 (Sup. Ct. N.Y. Co. Nov. 19, 2012), *aff'd* 106 A.D.3d 663 (1st Dep't 2013).

imputed to RBI well before EGS was ever engaged.   Therefore, RBI's legal malpractice claim fails.

### C.        Proximate Cause is Utterly Absent

In order to adequately plead causation in a legal malpractice action, a plaintiff must plead facts sufficient to show that it would not have sustained actual damages but for the attorney's negligence.  *Collins v. Felder*, 785 F.App'x at 10.  The failure to properly allege proximate cause in a legal malpractice action warrants dismissal, regardless of whether the attorney was negligent. *See Knox v. Aronson, Mayefsky & Sloan, LLP*, 168 A.D.3d 70, 75 (1st Dep't 2018) ("Even assuming AMS was negligent in failing to move for attorneys' fees, by agreeing as part of the settlement to forgo any award of attorneys' fees except for $20,000, plaintiff cannot show that but for AMS's negligence she would not have sustained the loss"); *Siwiec v. Rawlins*, 103 A.D.3d 703, 704 (2d Dept 2013) (affirming dismissal because "the complaint fails to allege facts sufficient to establish that the underlying action would have been successful or that the defendants proximately caused the plaintiff to sustain damages").

Plaintiffs' causation theory is irreconcilable with its allegations in the Nevada Action.  In its amended complaint in Nevada, Plaintiffs assert that, "[a]s a direct and proximate result of" Page's misrepresentation concerning the status of the patent applications, they have "suffered money damages at least in excess of $5.1 million . . ."  Touitou Decl. Ex. 13 (Nevada Action Am. Comp.) ¶40.  Plaintiffs are bound by that admission and cannot inconsistently allege here that the same losses were proximately caused by EGS.  *Perkins v. Perkins,* 226 A.D.2d 610, 641 (2d Dept. 1996) (litigants should "not be permitted to play fast and loose with the courts by advocating contrary positions in different legal proceedings"); *see also Wadsworth Condos, LLC v. 43 Park Owners Group, LLC,* 55 Misc. 3d 1206(A), 55 N.Y.S.3d 695 (Sup. Ct., N.Y. Co., 2016) ("The

doctrine of judicial estoppel or estoppel against inconsistent positions precludes a party from taking a position in one legal proceeding which is contrary to that which he or she took in a prior proceeding, simply because his or her interests have changed").

Plaintiffs' causation theory fails for the additional reason that the assignment-for-stock arrangement with Page was a "done deal" long before EGS was ever retained. Plaintiffs' allegation that they later relied on EGS to vet information that they previously investigated in reaching their pre-merger deal with Page is contradicted by facts known to them. *See Stolmeier v. Fields*, 280 A.D.2d 342, 343 (1st Dep't 2001) (attorney's alleged failure to notify client that it needed a home improvement contractor license before beginning construction was not proximate cause of client's losses where client was aware that contractor licensure was required prior to representation by counsel). Moreover, even if Plaintiffs' claims of reliance were supported by the facts, on the day the merger closed, Rocketfuel unequivocally advised EGS that, "[t]he patents are not critical to the business … [T]oday, the patent position is not critical and RocketFuel will be able to proceed identically as if they did not have any patents." Touitou Decl Ex. 4 (June 27, 2018 email and attachment). That admission puts an end to any claim that Plaintiffs were unaware that the viability of the patent applications was tenuous.

The undisputed chronology of events demonstrates the absence of any causation. On January 8, 2018, Page, Funk, and Yankowitz confirmed their plan for Page and Funk to form RBC for the purpose of Page assigning his five patent applications to the soon-to-be-formed company. *See* Touitou Decl. Ex. 3 (LOI). On January 12, 2018, Page assigned the applications to RBC, the same day the company was formed, pursuant to the LOI. *See id.* and Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-10. In February 2018, RBC "paid a non-refundable commitment fee of $250,000" to B4MC "pursuant to a non-binding letter of intent to enter into a proposed

merger transaction."  Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-9; *see also* Touitou Decl. Ex. 8 (B4MC Unaudited Financial Statements) Notes (1)(a) and (2)(a).  RBC retained EGS thereafter on March 2, 2018.  *See* Touitou Decl. Ex. 2 (Engagement Agreement). These facts show that, before EGS was ever retained, the $250,000 was paid, the patent applications were assigned to RBC and the principals of RBC and B4MC had reached an agreed-in-principle to the merger pursuant to the LOI. *See, e.g., Superior Tech. Sols., Inc. v. Rozenholc*, 147 A.D.3d 485 (1st Dep't 2017) (attorney's alleged negligence in not sending out renewal notice was not the proximate cause of plaintiff's injury where plaintiff already knew that lease renewal notice had to be in writing and that the lease would soon expire).

### D.      Plaintiffs Fail to Allege Actual Damages

Under New York law, "a plaintiff must plead and prove actual, ascertainable damages as a result of an attorney's negligence." *Janker v. Silver, Forrester & Lesser, P.C.*, 135 A.D.3d 908, 909 (2d Dep't 2016).  "Conclusory allegations of damages or injuries predicated on speculation cannot suffice for a malpractice action, and dismissal is warranted where the allegations in the complaint are merely conclusory and speculative."  *Katsoris v. Bodnar & Milone, LLP*, 186 A.D.3d 1504, 1506 (2d Dep't 2020).  Plaintiffs allege that it suffered $11 million in damages because Page received the "value" of $11 million for his share of the merged companies.  *See* Touitou Decl. Ex. 1 (SAC.) ¶¶22, 92.  This damages assertion is wildly speculative.

As alleged in the SAC, Page swapped his shares in RBC for shares in B4MC at the closing of the reverse merger transaction.  *See* Touitou Decl. Ex. 1 (SAC) ¶21.  According to the Contribution Agreement, B4MC was a shell company with no assets and no liabilities and had not conducted any business since May 12, 2015.  *See* Touitou Decl. Ex. 6 (Contribution Agreement) §3.8; *see also* Touitou Decl. Ex. 5 (Super 8-K) p. 4 ("Prior to the Business Combination, B4MC

was a 'shell company'…").  According to B4MC's unaudited financial statements, at the time of the merger, the stockholders' equity in the company was a negative $137,203.  *See* Touitou Decl. Ex. 8 (B4MC Unaudited Financial Statements) p.3.  In addition, B4MC had no revenues and suffered a net loss of $39,065.  *Id.*, p. 4.  It defies plausibility that anyone obtained $11 million in "value" from a company whose business did not generate any revenues.

The dubious state of RBC's business was recognized by its own auditors.  In its June 27, 2018 audit report, it stated:

> As discussed in Note 2 to the financial statements, the Company reported a loss from operations of $3,805, a net loss of $253,305, and a negative cash flow from operations of $250,305 for the period from January 12, 2018 (date of inception) through March 31, 2018; and has not commenced operations. These factors, among others, *raise substantial doubt regarding the Company's ability to continue as a going concern.*

Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-1 (emphasis added).  Notably, RBC's Audited Financial Statements assigned no value to the five patent applications assigned to the company, explaining, "[n]o value was ascribed to the intellectual property rights since no patents have been issued *and there can be no assurance that any patents will be issued.*"  *Id.*, F-10 (emphasis added).  Plaintiffs' admission that the patent applications were Rocketfuel's only assets demonstrate that its claims of lost "value" are unsustainable.  *See* Touitou Decl. Ex. 1 (SAC) ¶20. Its filing with the SEC demonstrates the speculative nature of its claimed damages.  In it, Plaintiffs admitted that:

> *We are a start-up company, and we may be unable to generate significant revenues and may never become profitable.*
>
> We are a start-up company that has not generated revenue to date and we may incur significant operating losses for the foreseeable future. We may not be able to validate and create business to business market for blockchain technology and infrastructure in a manner that will generate significant revenues. In addition, any revenues that we may generate may be insufficient for us to become profitable.
>
> In particular, potential investors should be aware that we have not proven that we can raise sufficient capital in the public and/or private markets; successfully develop a fully

functional blockchain technology platform; build a pipeline of businesses seeking such services from us, develop and maintain relationships with key strategic partners that will be necessary to optimize the market value of our services; respond effectively to competitive pressures; or recruit and build a management team to accomplish our business plan. If we are unable to accomplish these goals, our business is unlikely to succeed.

Our future capital needs are uncertain and our independent registered public accounting firm has expressed in its report on our 2018 audited financial statements a substantial doubt about our ability to continue as a going concern. Our ability to continue as a going concern is dependent on our ability to raise additional capital and our operations could be curtailed if we are unable to obtain the required additional funding when needed.  We may not be able to do so when necessary, and/or the terms of any financings may not be advantageous to us.

Touitou Decl. Ex. 5 (Super 8-K) p.17 (emphasis in original).   Rocketfuel makes the same admissions in the Audited Financial Statements with respect to the success of the merger.  *See* Touitou Decl. Ex. 7 (RBC Audited Financial Statements) F-6 ("We will require additional financing in order to commence operations and execute on our business plan. However, there can be no assurances that we will be successful in raising the additional capital necessary to commence operations and execute on our business plan").

To the extent Plaintiffs attempt to justify the $11 million damages claim by alleging that RBI's shares were quoted at $9.00 per share on the OTC (over-the-counter) Pink Sheets[42] at the time of the filing of this case (SAC ¶¶22, 92), that should be disregarded by the Court.  The proper

---

[42]        "The OTC Pink Sheets is a quotation service that certain broker-dealers use to post offers to sell and to buy securities not listed on a national exchange, and is not itself an exchange." *S.E.C. v. Boock*, 2011 WL 3792819, at *18 (S.D.N.Y. Aug. 25, 2011).  The OTC Pink market are for high-risk investments because, "[w]ith no minimum financial standards, this market includes foreign companies that limit distribution of their disclosure to their home market, penny stocks and shells, as well as distressed, delinquent, and dark companies not able or willing to provide adequate information to investors," and, as such, "Pink requires the least in terms of company disclosure and the most in terms of investor research and caution."  *In re Arctic Glacier Int'l, Inc.*, 2016 WL 3920855, at *20 (Bankr. D. Del. July 13, 2016), *aff'd*, 255 F.Supp.3d 534 (D. Del. 2017), *aff'd*, 901 F.3d 162 (3d Cir. 2018) (citations omitted).  For example, on July 13, 2021, RBI's stock closed at approximately $1.21 per share. *See* https://www.marketwatch.com/investing/stock/rkfl/download-data?mod=mw_quote_tab (last viewed on July 14, 2021 at 11:30 am).

measure of damages is based at the time of the merger—not at the time of the commencement of this action—for the difference between what BFMC gave and what it received.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) ("[W]e look to New York law that follows the well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale"); *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1310 (2d Cir. 1993) (for claim concerning misrepresentation of value of merged company, damages were measured from date of the merger).  As admitted in the Super 8-K, at the time of the merger, RBI's "common stock is considered a 'penny stock' and may be difficult to sell."  Touitou Decl. Ex. 4 (Super 8-K) p.13.

Lastly, Plaintiffs complain that Page received $11 million in "value" in "exchange for conveyance of nothing," when in actuality, Page conveyed nothing, and received nothing in exchange, based on the documents incorporated by reference in the SAC.  Touitou Decl. Ex. 1 (SAC.) ¶92.  Such assertion of "value" is the quintessential "[c]onclusory allegations of damages or injuries predicated on speculation [which] cannot suffice for a malpractice action."  *Katsoris v. Bodnar & Milone, LLP*, 186 A.D.3d at 1506.  Thus, the first claim for legal malpractice must be dismissed.

## IV.   THE BREACH OF CONTRACT AND FIDUCIARY DUTY CLAIMS <u>ARE DUPLICATIVE OF THE DEFICIENT LEGAL MALPRACTICE CLAIM</u>

Plaintiffs' second claim for breach of contract and third claim for breach of fiduciary duty should be dismissed as duplicative of the deficient legal malpractice claim.  "New York law holds that, where a breach of contract or breach of fiduciary duty claim is premised on the same facts and seeks relief identical to that sought in a legal malpractice cause of action, such claims are redundant and should be dismissed." *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F.Supp.2d 518, 532 (S.D.N.Y. 2010), *aff'd*, 410 F.App'x 408 (2d Cir. 2011); *see also*

*Barrett v. Goldstein*, 161 A.D.3d 472, 473 (1st Dep't 2018) ("The claims for fraud and breach of fiduciary duty are duplicative of the legal malpractice claim, since they all arose from identical facts and allege the same damages").  The rule against duplicative claims applies, even where the legal malpractice claim is dismissed for failure to state a claim.  *See Knox v. Aronson, Mayefsky & Sloan, LLP*, 168 A.D.3d at 76 (dismissing breach of fiduciary duty claim as duplicative of the dismissed legal malpractice claim).

Plaintiffs' breach of contract and breach of fiduciary duty claims are based on the same facts and allege the same damage as the legal malpractice claim and, thus, they should be dismissed.  *Compare* Touitou Decl. Ex. 1 (SAC) ¶¶104-108 *with* ¶¶109-112.

## V.   THE DECLARATORY JUDGMENT CLAIMS FAIL TO SATISFY THE CASE AND CONTROVERSY STANDARD

Lastly, Plaintiffs seek a declaratory judgment in Counts IV through VI with respect to whether EGS may use as an affirmative defense the release exchanged as part of a settlement of a fee dispute between EGS and Rocketfuel.  Touitou Decl. Ex. 1 (SAC) ¶¶ 120-154.  Plaintiffs seek a declaratory judgment in anticipation of a defense that EGS may or may not raise in this action. This is improper and the declaratory judgment counts should be dismissed as they fail to satisfy the case or controversy standard for declaratory relief under 28 U.S.C. § 2201.

The Supreme Court has made clear that a declaratory judgment claim does not qualify as a "justiciable case within the meaning of Article III" where plaintiff "seeks a declaratory judgment as to the validity of a defense" that the defendant may or may not raise because any judgment in the action "would not resolve the entire case or controversy as to any one of them, but would merely determine a collateral legal issue governing certain aspects of their pending or future suits." *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998); *see also Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F.Supp.2d 398, 407–08 (S.D.N.Y. 2012) ("[T]he Declaratory

Judgment Act cannot be used to test the validity of an affirmative defense that a plaintiff anticipates the defendant will assert").

Here, a declaratory judgment on whether EGS can assert release as an affirmative defense would not resolve whether Plaintiffs have any claim against the firm.  If Plaintiffs' malpractice, breach of fiduciary duty and/or breach of contract claims survive dismissal, the validity of a release affirmative defense is subject to adjudication after it is asserted, not before.  Accordingly, the declaratory judgment claims are not ripe and should be dismissed.  *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 249–50 (S.D.N.Y. 2006) (granting dismissal where declaratory judgment claim sought "resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action").

## <u>CONCLUSION</u>

For all the foregoing reasons, it is respectfully submitted that Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) be granted in its entirety, together with such other and further relief as the Court may deem just and proper.

Dated:   New York, NY
          July 14, 2021

                     Respectfully submitted,

                     AKERMAN LLP

                     *Philip Touitou*

                     By: _____
                        Philip Touitou, Esq.
                        Steven M. Cordero, Esq.
                     1251 Avenue of the Americas, 37th Floor
                     New York, New York 10020
                     Telephone: (212) 880-3800
                     Facsimile: (212) 880-8965
                     Email: philip.touitou@akerman.com
                        steven.cordero@akerman.com

                     *Attorneys for Defendant*

25